# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01402-COA

**TRUSTMARK NATIONAL BANK**                                    **APPELLANT**

**v.**

**ENLIGHTENED PROPERTIES, LLC**                                    **APPELLEE**

DATE OF JUDGMENT:                  11/19/2020
TRIAL JUDGE:                       HON. JENNIFER T. SCHLOEGEL
COURT FROM WHICH APPEALED:         HARRISON COUNTY CHANCERY COURT,
                                   SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:            CHRISTOPHER HANSER MEREDITH
ATTORNEYS FOR APPELLEE:            ROBERT THOMAS SCHWARTZ
                                   F. M. TURNER III
                                   CHRISTIAN JANE'T STRICKLAND
NATURE OF THE CASE:                CIVIL - CONTRACT
DISPOSITION:                       AFFIRMED - 11/02/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., McDONALD AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.    On June 21, 2020, the Chancery Court of Harrison County began a trial on Trustmark National Bank's (Trustmark) complaint for declaratory relief against Enlightened Properties LLC (EP), which ultimately concluded on September 23, 2020. On November 19, 2020, the chancery court entered an order containing a ruling in favor of EP. Aggrieved by the chancery court's judgment, Trustmark appealed.

## FACTS AND PROCEDURAL HISTORY

¶2.    EP developed a fitness facility that operated under the name "E-Fit," which EP

ultimately sold to Cedar Lake Wellness Facility LLC (CLWF) in 2008. CLWF also purchased from EP approximately six acres on which the E-Fit facility was located. A separate entity, Enlightened Fitness and Wellness Inc. (EFW), was in charge of the day-to-day operations of the E-Fit facility and was the only entity that generated income. EP retained ownership of the remaining land surrounding the E-Fit facility, approximately thirty-three acres.

¶3.    On July 25, 2008, CLWF entered into a term loan agreement (CLWF loan agreement) with Trustmark National Bank (Trustmark) associated with financing of the E-Fit facility. The term loan agreement between Trustmark and CLWF covered two separate term loans in the amounts of $9,129,000 and $2,107,500, for a total of $11,236,500. Also on July 25, 2008, EFW entered into a separate term loan agreement (EFW loan agreement) with Trustmark associated with the inventory and equipment in the E-Fit facility. That loan agreement also covered two separate term loans in the amounts of $1,440,000 and $750,000, for a total of $2,190,000. The total amount borrowed by CLWF and EFW for the benefit of E-Fit was $13,426,500. In turn, CLWF executed two deeds of trust on the E-Fit facility and property (six acres) in favor of Trustmark. One deed of trust was offered as collateral for the CLWF loan agreement, and the other deed of trust was offered as collateral for the EFW loan agreement. Both deeds of trust were executed on July 25, 2008. Additionally, in consideration for both the CLWF loan agreement and the EFW loan agreement, EP executed two deeds of trust in favor of Trustmark that encumbered EP's thirty-three acres surrounding the fitness facility. The EP deed of trust securing the CLWF loans was recorded in the

2

Harrison County land records as instrument number 2008-4097-T-J2 (EP D/T 4097). The EP deed of trust securing the EFW loans was recorded in the Harrison County land records as instrument number 2008-4104-T-J2 (EP D/T 4104). There were additional personal guaranty agreements executed by various individuals in conjunction with the term loan agreements, but they are not directly at issue in this appeal.

¶4.    As a part of a restructuring of the debts of CLWF and EFW in 2011, Trustmark executed a release in favor of EP (Release) on October 4, 2011. The effect of the Release is the subject of this litigation. The Release included two attachments. The body of the Release indicated that Exhibit A was a term loan agreement executed on July 25, 2008. The term loan agreement attached as Exhibit A was the EFW loan agreement. The Release also stated that it pertained "only to that certain Deed of Trust attached hereto as Exhibit B." However, instead of a deed of trust, the property description for the thirty-three acres EP owned was attached as Exhibit B.[1] After the Release was executed, Trustmark recorded a cancellation of EP D/T 4097 on October 28, 2011.

¶5.    On February 24, 2016, Trustmark filed a complaint in the Chancery Court of Harrison County seeking in Count I confirmation of interest in real property, in Count II expungement of authority to cancel, and in Count III declaratory relief against EP. According to the complaint, in August 2015, the underlying loans to CLWF and EFW went into default, and on August 17, 2015, Trustmark sent a default notice to both CLWF and EFW, as well as a courtesy copy to EP. In its complaint, Trustmark further alleged that EP D/T 4097 had been

---

[1] This same property description was attached to both EP D/T 4097, which secured the loan to CLFW, and EP D/T 4104, which secured the loan to EFW.

inadvertently cancelled and that the Release only provided for the release of EP D/T 4104. On February 25, 2016, Trustmark executed and filed of record a second authority to cancel for the EP D/T 4104.

¶6. On January 9, 2019, at the beginning of a hearing on competing motions for summary judgment, Trustmark voluntarily dismissed Counts I and II of the complaint, leaving only the question of declaratory relief requested in Count III for the chancellor's consideration. At this hearing, the chancery court found the Release to be "ambiguous as to which deed(s) of trust Trustmark agreed to release," and the court determined extrinsic evidence would be considered to resolve the issue. Because genuine issues of material fact existed, the chancery court denied both parties' motions for summary judgment and ordered that the matter proceed to trial. An order was entered of record to this effect on July 25, 2019. On June 21, 2020, the trial on Trustmark's claim for declaratory relief began, and it concluded on September 23, 2020. On November 19, 2020, the chancery court entered an order finding, in part, as follows:

> [F]irst, that if there is no ambiguity in the Release, the land description of the EP property and the terms of the Release unencumbered all of EP's property described and attached to the Release. Alternatively, from the viewpoint that there is an ambiguity in the Release, the Court resolves it in favor of the Defendant, EP, for the reasons set forth herein.

### STANDARD OF REVIEW

¶7. In cases involving the construction of contracts, two separate standards of review are required. A de novo standard of review should be applied in first determining whether a contract is ambiguous. *Gibbs v. Moody*, 180 So. 3d 830, 833 (¶10) (Miss. Ct. App. 2015)

4

(citing *Royer Homes of Miss. Inc. v. Chandeleur Homes Inc.*, 857 So. 2d 748, 751 (¶4) (Miss. 2003)). Pursuant to *Royer*, if there is no ambiguity, we must enforce the contract as it is written. *Royer*, at 857 So. 2d 752 (¶7). However, in the event an ambiguity is found, the subsequent interpretation presents a question of fact committed to the fact finder. *Id*. In that instance, this Court will not disturb a chancellor's findings of fact unless they are manifestly wrong or clearly erroneous or unless the chancellor applied an erroneous legal standard. *Gibbs*, 180 So. 3d at 832-33 (¶10).

## ANALYSIS

¶8. Trustmark's arguments on appeal are stated in the alternative. First, Trustmark argues that the Release is not ambiguous and that it clearly required Trustmark to release **only** EP D/T 4104. In the alternative, if the Release is found to be ambiguous, using the canons of construction in the manner Trustmark contends is appropriate, the Release should still be interpreted to require Trustmark to release only EP D/T 4104.

### I. Is the Release ambiguous?

¶9. As stated above, a de novo standard of review is used to make the determination as to whether the Release is ambiguous. *Id*. at 833 (¶10). The court in *Royer*, also gave direction as to how to begin this process:

> This Court has set out a three-tiered approach to contract interpretation. Legal purpose or intent should first be sought in an objective reading of the words employed in the contract to the exclusion of parol or extrinsic evidence. First, the "four corners" test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement. We must look to the "four corners" of the contract whenever possible to determine how to interpret it. When construing a contract, we will read the contract as a whole, so as to give effect to all of its clauses. Our concern is not nearly so much with

5

what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy. Thus, the courts are not at liberty to infer intent contrary to that emanating from the text at issue. On the other hand, if the contract is unclear or ambiguous, the court should attempt to harmonize the provisions in accord with the parties' apparent intent. Only if the contract is unclear or ambiguous can a court go beyond the text to determine the parties' true intent. The mere fact that the parties disagree about the meaning of a contract does not make the contract ambiguous as a matter of law.

Secondly, if the court is unable to translate a clear understanding of the parties' intent, the court should apply the discretionary "canons" of contract construction. Where the language of an otherwise enforceable contract is subject to more than one fair reading, the reading applied will be the one most favorable to the non-drafting party. Finally, if the contract continues to evade clarity as to the parties' intent, the court should consider extrinsic or parol evidence. It is only when the review of a contract reaches this point that prior negotiation, agreements[,] and conversations might be considered in determining the parties' intentions in the construction of the contract. Of course, the so-called three-tiered process is not recognized as a rigid "step-by-step" process. Indeed, overlapping of steps is not inconceivable.

*Royer*, 857 So. 2d at 751-53 (¶¶10-11) (citations and internal quotation marks omitted). So we begin the process by reviewing the "four corners" of the Release. We must read the contract as a whole so as to give effect to, or harmonize, the various provisions of the agreement, if possible.

¶10. The Release begins as follows:

<u>**RELEASE**</u>

**THIS RELEASE** (this "Agreement") is made and entered into effective as of the 4th day of October, 2011, by Trustmark National Bank (the "Creditor") in favor of Enlightened Properties, LLC ("Hypothecator").

**WITNESSETH**:

WHEREAS, under a Term Loan Agreement dated July 25, 2008, a copy of which is attached hereto as Exhibit "A," the Creditor secured from Hypothecator a Deed of Trust in and to certain property belonging to Hypothecator (the "Deed of Trust") to guarantee loans extended to Cedar Lake

6

Wellness Facility, LLC ("Cedar Lake") and Enlightened Fitness and Wellness, Inc.("E-Fit")(collectively, the "Companies");

WHEREAS, as part of a restructuring of the debts of the Companies, Creditor and Hypothecator have come to an agreement whereby Creditor will be paid a sum of money in return for the cancellation of the Deed of Trust.

These beginning paragraphs of the Release reveal that it was a part of a "restructuring of the debts of the Companies." As indicated in the Release, the term "Companies" includes both CLWF[2] and EFW.[3] Thus, as part of the "restructuring of debts," Trustmark was to be paid a sum of money, and in return, Trustmark was to cancel "the Deed of Trust" that Trustmark had against EP's property securing the debts of the Companies.

¶11.    While the Release stated in part that "**the Creditor secured from Hypothecator a Deed of Trust in and to certain property belonging to Hypothecator (the "Deed of Trust") to guarantee loans extended to Cedar Lake Wellness Facility, LLC ("Cedar Lake") and Enlightened Fitness and Wellness, Inc.("E-Fit") (collectively, the "Companies")**," the facts show that this statement in the Release is simply not true. There is not a deed of trust (singular) that secures the loans of both Companies as the above portion of the agreement seems to indicate. Both CLWF and EFW entered into separate term loan agreements with Trustmark on July 25, 2008. Each of those separate loan agreements

---

[2] Cedar Lake Wellness Facility LLC is referred to in the release as "Cedar Lake" but in other documents as CLWF. For clarity, we will refer to the company as CLWF in this opinion.

[3] Enlightened Fitness and Wellness Inc. is referred to in the release as "E-Fit" but in other documents as EFW. For clarity, we will refer to the company as EFW in this opinion. While the fitness facility was operated under the name E-Fit, the company, apparently was not a legal entity that was a party to any of the contracts/agreements at issue.

7

covered two separate loans to each entity, for a total of four loans. EP executed two separate deeds of trust on July 25, 2008, in favor Trustmark: one to guarantee CLWF's loans and one to guarantee EFW's loans. It is clear that Trustmark did not secure **a** deed of trust (singular) from EP to guarantee the loan**s** (plural) of CLWF **and** EFW. The following paragraph of the Release states that as part of the restructuring of the debts of "the Companies," Trustmark will be paid a sum of money, and in return, Trustmark will cancel "the Deed of Trust." This paragraph compounds the problem, as it continues to refer to the debts of both CLWF and EFW. At the outset, the facts and the language used in the Release are in conflict as to a fundamental element of the Release.

¶12. Trustmark contends that any ambiguity is cleared up by reading EFW's term loan agreement, attached as Exhibit A, together with the provision of the Release that states:

> Notwithstanding anything to the contrary contained herein, this Release is intended to pertain only to that certain Deed of Trust attached hereto as Exhibit "B," which such Deed of Trust was executed in connection with the property owned by Hypothecator and referred to in the Term Loan Agreement as the "EP Deed of Trust[.]"

While this provision indicates that it only pertains to that certain deed of trust attached to the Release as Exhibit B, there was no deed of trust attached to the Release as Exhibit B. Instead, attached as Exhibit B, was the legal description of EP's property that was encumbered by both EP D/T/ 4104 securing EFW's loans and EP D/T 4097 securing CLWF's loans. Trustmark maintains, despite this alleged error, that the only deed of trust the Release is applicable is the "EP Deed of Trust" identified in the attached term loan agreement, which is EP D/T 4104 that secured the EFW term loan agreement. However,

8

both term loan agreements were executed on July 25, 2008, and in both term loan agreements the definition section defines the "EP Deed of Trust" as being joined by the "Borrower." Thus, in the CLWF term loan agreement, the "EP Deed of Trust" refers to EP D/T 4097, and in the EFW term loan agreement the "EP Deed of Trust" refers to EP D/T 4104.

¶13. The "four corners" rule requires that we read the agreement as a whole and harmonize its provisions, if possible. We cannot simply pick out one part of the agreement that seems clear and disregard the others that may "muddy the water." Immediately before the above cited "notwithstanding provision," in the same paragraph, the Release states that Trustmark . . .

> does hereby absolutely and unconditionally release, forever discharge, and acquit Hypothecator from any and all liability Hypothecator may have in connection with the Deed of Trust and under that certain Term Loan Agreement executed between the parties on July 25, 2008, and all claims, actions and causes of action, liens, judgments, demands, liabilities, obligations, injuries, expenses, losses and damages that the Creditor might now have or which may accrue in the future in connection with the Deed of Trust **and/or any debts presently owed by the Companies**, whether presently known or unknown, and of every nature and extent whatsoever, on account of or in any way concerning or arising out of Deed of Trust. This release will not extend to any claim arising out of any documents executed between Hypothecator and Creditor in connection with debts or liabilities that are unrelated to the Companies.

(Emphasis added). In this provision, Trustmark appears to grant EP a complete release of liability relating to the "debts of the companies." This language would seem to include both deeds of trust at issue. Trustmark contests any such "global" release and argues that the language of this paragraph is limited to EP's liability arising out of or connected to EP D/T 4104.

9

¶14.    Finally, another provision that seems to point toward Trustmark's total release of EP's property provides as follows:

> Should it develop that there are any mistakes in this Agreement which causes the release of Hypothecator to be less that complete, or any other documents are necessary to effectuate the terms of this Agreement, the Creditor shall execute any and an all documents and any and all instruments, and do any and all things necessary, to effectuate a full, final and complete release and discharge with regard to said Deed of Trust and the Term Loan Agreement.

To be clear, both deeds of trust at issue here are liens against EP's thirty-three-acre tract surrounding the fitness facility. A complete release would seem to refer to a total release of Trustmark's liens against this property, which would include both deeds of trust, not just one. However, Trustmark argues that the Release is limited by the concluding language "with regard to said Deed of Trust and the Term Loan Agreement." This limiting language, however, is less than clear in light of the clauses and issues discussed above.

¶15.    In *Dalton v. Cellular South Inc.*, 20 So. 3d 1227, 1232 (¶10) (Miss. 2009), the Mississippi Supreme Court defined ambiguity as "a susceptibility to two reasonable interpretations." Further, the supreme court went on to state:

> A widely-quoted judicial definition of "ambiguous" is as follows: An "ambiguous" word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Id*. (quoting *Walk-In Med. Ctrs. Inc. v. Brever Capital Corp.*, 818 F. 2d 260, 263 (2d Cir. 1987)). In *Dalton*, the court held that the subject contract clauses, standing alone, were unambiguous; however, when read together, they were in conflict. *Id*. Furthermore, "[a]

conflict within the whole meets the very definition of ambiguity." *Id*.

¶16. In the case at hand, there are multiple provisions in the agreement that on their face appear to be in conflict with one another. This Court cannot, with any measure of confidence, reconcile the conflicting provisions of the Release to determine whether the parties intended that EP's property would be released from both deeds of trust or only one. This Court finds that the Release is ambiguous. Therefore, Trustmark's argument that the Release is unambiguous is without merit. Further, the chancery court erred as a matter of law to the extent the chancellor ruled that the Release is unambiguous.

## II. Did the chancellor err by resolving the ambiguity in favor of EP?

¶17. Having found the Release to be ambiguous, we must now proceed to the next steps in our analysis as set out in *Royer*. In our effort to resolve the ambiguity and to determine the parties' intent, we are mindful that, as stated in *Royer*, this is not a rigid "step-by-step" process and may well involve overlapping steps. *Royer*, 857 So. 2d at 753 (¶11).

### A. Canons of Construction

¶18. Most cases describe the next step as the consideration of the discretionary canons of contract construction. Trustmark contends that the chancery court erred by not applying the canons to resolve the ambiguity in this case. Trustmark has raised three canons of construction that Trustmark contends should have resulted in an interpretation of the Release to require the cancellation of only one deed of trust.

¶19. First, Trustmark argues that any ambiguity should have been construed in its favor and against EP because EP's attorneys drafted the Release. The testimony at trial confirms that

11

Mike Frascogna and Shawnassey Brooks were retained by EP, and others, to represent them in negotiations with Trustmark in an effort to restructure the debts of the companies, to obtain the release of individual guarantors, and obtain the release of EP's property. Frascogna was the point person in the negotiations with Trustmark. He testified that Trustmark was very interested in a restructuring of the loans with a "buy back" of the individual guarantors' liability. At one of their first meetings, Frascogna testified that Trustmark gave him a document that outlined the debts that were the subject of the negotiations. This document was introduced as Exhibit 14 at trial and is attached to this opinion. *See infra* Appendix. This document was presented at the beginning of the negotiations and seemed to indicate that EP's thirty-three acres were collateral for only one of CLWF's loans and not collateral for either of EFW's loans.[4] Brooks testified that she drafted the Release based upon the information she received from Frascogna after his meetings with Trustmark. Brooks' drafts were sent to Trustmark, and revisions were made at Trustmark's suggestion. Brooks testified that Trustmark furnished the attachments to the Release, but she did not receive them until after Trustmark had returned the executed Release to her. In other words, Brooks attached the exhibits provided by Trustmark as Exhibits A and B sometime after Trustmark had executed the Release.

¶20. In *Estate of Parker v. Dorchak*, 673 So. 2d 1379, 1382 (Miss. 1996), the Mississippi Supreme Court stated:

[T]his Court should be hesitant to grant the Dorchaks relief from a provision

[4] Trustmark argues that the EP deeds of trust are properly recorded and that EP had constructive notice that there were two deeds of trust encumbering the EP property.

12

which was of their own making. There are, **however**, also canons of contract construction which favor the Dorchaks. . . . **In addition**, there is a substantial amount of extrinsic evidence in this case which leads to the conclusion that the parties did not contemplate the accrual of interest payments in the manner urged by the Executrix.

(Emphasis added). The supreme court ultimately held that after "[t]aking into consideration **all** relevant factors, it is clear that the trial judge reached the correct conclusion . . ." in ruling in favor of the Dorchaks despite the fact that they drafted the agreement. *Id.* at 1383.

¶21. In *Reffalt v. Reffalt*, 94 So. 3d 1222, 1225 (¶11) (Miss. Ct. App. 2011), this Court addressed a chancery court's application of the canons of contract construction. In *Reffalt*, we stated in part:

> Stephen contends that the provision must be interpreted against Gloria because she drafted it. We accept that vagueness and ambiguity are more strongly construed against the party drafting the contract. However, employment of the canons of construction is **discretionary**; construction against the drafting party can control the result, **but not in all cases**. This canon may control where there is no strong evidence showing the parties' intent, or if it is required to do equity where the drafting party was more knowledgeable about the subject matter of the contract. It may also control where the parties have unequal bargaining power. But this case presents strong evidence of the parties' intent; thus, the fact that Gloria drafted the provision at issue was just one factor to be considered by the chancellor.

*Id.* (emphasis added). This Court ultimately held that Stephen and Gloria's property settlement agreement was ambiguous, but after a review of the record we concluded that the chancellor's finding regarding the parties' intentions was supported by substantial evidence, and Stephen's assertions to the contrary were without merit. *Id.* at 1226 (¶15).

¶22. In the case at bar, the parties had equal bargaining power. While it is clear that EP's counsel actually produced the "hard copy" of the Release, both parties were involved in

deciding upon the content of the Release. Trustmark was more knowledgeable about the earlier transactions that were the subject of the Release and even provided the exhibits for the Release. Based upon the matters discussed above and below, we find that this canon is not controlling as to the intent of the parties in this case and does not resolve the ambiguity in the Release.

¶23. Second, another canon of construction is that an "expression of one thing is the exclusion of another." In *Gilchrist Tractor Co. v. Stribling*, 192 So. 2d 409, 415-16 (Miss. 1966), which Trustmark cites, the Court addressed this canon:

> Where only one exception is mentioned in a contract, the rule of *expressio unius est exclusio alterius* applies and exceptions not mentioned cannot be engrafted upon it. . . .
>
> If it had been contemplated that Stribling should continue to have the right to supply Cook or Hyde with Caterpillar equipment until these credits were exhausted in the course of writing seven contracts, it would have been easy to say so. The logical assumption is that, if it had been so intended, there would have been some reference to the fact, especially since the retaining of such a right by Stribling is inconsistent with the basic purpose of the main transaction, and would be an exception to the Non-Competition Agreement.

(Citations omitted).

¶24. Trustmark contends that the Release clearly references "that certain" deed of trust described in the term loan agreement as an EP deed of trust.[5] Trustmark contends that the reference to one deed of trust and the omission of the other means the other EP deed of trust

---

[5] As noted above, EP executed two separate deeds of trust that encumbered its thirty-three-acre tract of land: one to secure the CLWF term loan agreement and one to secure the EFW term loan agreement. Both term loan agreements and both deeds of trust were all executed on the same date. Each term loan agreement defined the "EP Deed of Trust" to be that deed of trust executed by the borrower in that particular term loan agreement.

was intentionally excluded. In other words, Trustmark contends that the Release clearly refers to only one deed of trust and that under this canon of contract construction, all other deeds of trust are excluded. Accordingly, Trustmark argues that the EFW term loan agreement was attached to the Release, and the EP deed of trust defined in that term loan agreement is EP DT 4104; thus, the intent of the agreement was to release only that specific deed of trust. However, the first paragraph of the release also stated that under a term loan agreement attached as Exhibit A, Trustmark secured from EP **a** deed of trust to guarantee **loans** extended to both CLFW and EFW. Again, as noted above, there is not a deed of trust (singular) that guarantees loans (plural) to both CLFW and EFW; there are two deeds of trust. Under the language in *Gilchrist* and the facts of this case, this clearly is a reference that more than one deed of trust may be included. There are numerous other references in the Release, discussed above and below, that indicate the intent to release both EP deeds of trust. Because of these conflicts, this canon does not resolve the ambiguity in the Release.

¶25.    Third, Trustmark argues that the specific language of the Release should govern over the general inconsistent language. Trustmark asserts that even if the Release contained global release language as EP suggests, the Release should be governed by a more specific clause limiting the scope of the Release to one "certain deed of trust." However, Trustmark's argument is flawed because the Release does not contain any specific language relating to the "certain deed of trust" that does not conflict with at least one other specific reference to the same "certain deed of trust." While the second paragraph of the Release refers specifically to a deed of trust executed in relation to a term loan agreement attached as

15

Exhibit "A," the same paragraph goes on to specifically describe the deed of trust as one guaranteeing loans to CLWF and EFW as noted above. While both of the descriptions of the "certain deed of trust" are specific in nature, they are conflicting. Further, in one paragraph, the Release states that it pertains "only to that certain Deed of Trust attached hereto as Exhibit B"; however, the document Trustmark provided to attach as Exhibit B is not a deed of trust. The document provided and attached was the property description that was attached to both EP deeds of trust. While this Court has the discretion to consider specific language to be controlling over general language, this canon does not resolve the ambiguity in this Release.

¶26.    EP argues that the court should consider the actions of the parties after the Release was executed. In *Rosenfelt v. Mississippi Development Authority*, 262 So. 3d 511, 518 (¶23) (Miss. 2018), the Court said:

> The course-of-performance evidence cited by Rosenfelt is likewise not relevant unless the written agreements are materially ambiguous. Only "[i]f the intent of the parties is not yet ascertained after 'four corners' analysis" will "the court will employ any applicable canons of contract construction" such as the "practical construction which the parties have placed upon the instrument." *Warren v. Derivaux*, 996 So. 2d 729, 735 (Miss. 2008) (citations omitted).

Immediately following the execution of the Release, Trustmark executed and recorded a cancellation of EP D/T 4097 on October 24, 2011. Subsequently, as negotiations continued regarding the restructuring of the debts of the companies, in December 2011 an attorney for Trustmark indicated in an email that Trustmark had already released one EP deed of trust and that it was his understanding that Trustmark was in the process of releasing the remaining

16

deed of trust that encumbered EP's property; however, that release was not completed at that time. In 2015, Trustmark took the position that EP D/T 4097 had been canceled inadvertently in 2011, and then Trustmark cancelled the deed of trust that Trustmark contends was required by the Release, EP D/T 4104. We do not find this activity to control the resolution of the ambiguity in this case.

¶27. We find the ambiguity in the Release cannot be resolved by the application of the discretionary canons of contract construction. Accordingly, we find the chancellor did not err by proceeding to consider parol evidence in order to resolve the ambiguity.

### B. Consideration of Parol Evidence

¶28. Trustmark argues that the chancery court erred by admitting into evidence and considering parol evidence in its ruling in EP's favor. Trustmark argues that even if it took the position that the consideration of parol evidence had been proper in this case, which it did not, the court erred in considering parol evidence that contradicted or added to the Release rather than assisting to explain the intended terms of the Release.

¶29. The first two steps of the analysis set forth in *Royer* follow:

> If the contract continues to evade clarity as to the parties' intent, the court should consider extrinsic or parol evidence. It is only when the review of a contract reaches this point that prior negotiation, agreements and conversations might be considered in determining the parties' intentions in the construction of the contract.

*Royer*, 857 So. 2d at 753 (¶11). In the case at hand, further consideration of parol evidence is necessary to gain clarity as to the intent of the Release.

¶30. Paul Benton was the first witness to testify on behalf of EP. He was a shareholder and

17

member of EFW and CLFW at the inception of the negotiations between EP and Trustmark. Benton testified that pursuant to his suggestion to the board members, attorney Mike Frascogna was hired to handle negotiations with Trustmark on EP's behalf. More specifically, Benton testified:

> Well, we explained to Mike what our situation was and what our situation was with the bank, and we asked him to help us to renegotiate the debt service. And, in fact, you know, how could we come up with a scenario where we paid the bank down on the note so that we could get where we could cash flow. And Mike said . . . that shouldn't be a problem paying down the note, but why don't we get something in return. And we all had Guaranties, and he said, well, why don't we buy back the Guaranties in return for paying down the note. . . . And very quickly that was part of the plan was to restructure the debt, buy back the Guaranties, and take and get Enlightened Properties' 33 acres released.

Benton testified that the release of the EP property that surrounded the fitness facility was a condition of paying down the bank note. The Release was a key component of the agreement, along with restructuring the debt and buying back the personal guaranties. According to Benton, "[t]he Trustmark representative told me that the EP property would be released and asked me to go to Enlightened Properties and secure the agreement." Benton's testimony is corroborated by EP's board minutes from its meeting on September 6, 2011. A copy of the board minutes was admitted into evidence, and Benton read portions of the document into the record at trial. Paragraph three of the minutes stated in part:

> Mr. Benton began addressing the investors regarding the pay down of the Trustmark note. Trustmark has agreed to accept a pay down of the notes owed and refinance the balance of the note in order that Efit and Cedar Lake can have a better chance to cash flow both operations and debt service. If the agreed upon pay down amount can be accomplished, **Trustmark will refinance the current Efit and Cedar Lake property as well as release the Enlightened Properties surplus property as collateral.** The closing with

18

Trustmark is scheduled to occur on September 15, 2011.

(Emphasis added). As part of the agreement, Benton paid Trustmark $240,000. He testified that he would not have made the payment had Trustmark not agreed to do the following: (1) restructure the debt; (2) release the personal guaranties; and (3) release EP's surplus property (thirty-three acres). Finally, Benton stated that Bob Hardison with Trustmark "was very clear and adamant that the collateral for the debt going forward was going to be the building and the pad that the building sat on. If he said it once, he said it twenty times."

¶31. Dorothy Dunning, R.N., was the second witness to testify on EP's behalf. Dunning was a member of both EP and CLWF at the inception of the negotiations between EP and Trustmark. She was also a shareholder and EFW board member. Dunning testified that she would not have been willing to join the other members in paying Trustmark an excess of $6,000,000 if she had believed that she would have remained obligated under the Hypothecation Reimbursement Agreement. She also testified that there was never "any suggestion that the Deed of Trust on EP's property securing the Cedar Lake loans would remain in effect after the loan was reduced by the guarantor payments." Finally, Dunning was provided a copy of the board minutes that were previously introduced into evidence, and she verified that the minutes reflected her understanding about the agreement that the EP surplus property (thirty-three acres) would be released as collateral.

¶32. George Salloum, M.D., was the third witness to testify on behalf of EP. Dr. Salloum was a shareholder in EFW and a member of EP and CLWF at the inception of the negotiations between EP and Trustmark. Dr. Salloum testified:

19

And our intent, our goals were to pay the bank loan down enough that we would be profitable, to get a return on our guaranties, . . . our personal guaranties off of all the loans, and to also those of us who were property members, we wanted to have the property unencumbered, receive the Deed of Trust back on the property on all loans. Not a partial, but a full. . . .

I understood that I was going to pay a certain amount of money down and then write them a check, and in return I would receive my personal guaranty back on all loans and the Enlightened Properties surrounding property would be released from the Deed of Trust on all loans.

Dr. Salloum was also provided a copy of the board minutes that were previously introduced into evidence, and he verified that the minutes also reflected his understanding that the EP surplus property (thirty-three acres) would be released as collateral. He testified that he would not have delivered over $200,000 to Trustmark if the EP property was not released.

¶33. Attorney Shawnassey Brooks drafted the release at issue on appeal and was the fourth witness to testify in EP's behalf. Admittedly, Brooks had little to no involvement in the negotiation process concerning the release agreement. Brooks' information regarding the terms of the release primarily came from EP's lead attorney, Mike Frascogna. Brooks testified that her understanding of the release was such that "in return for a pay-down . . . in addition to releasing some personal guaranties, that the Enlightened Properties property was going to be released." She testified that she drafted the "notwithstanding" provision to be clear that it was EP's thirty-three acres that were being released and not Cedar Lake's land where the building was actually located. According to Brooks, Trustmark's cancellation of both EP deeds of trust 4097 and 4104 after the Release was executed was consistent with the intention of the release.

¶34. Finally, Mike Frascogna, EP's lead attorney in the release negotiation process,

20

testified in EP's behalf. Arguably, Frascogna was EP's strongest witness because he had direct communications with both Trustmark and the EP board members. He also had personal knowledge of the events that took place throughout the entirety of the release negotiation and loan renewal process. Frascogna testified that his relationship with EP began in 2010 when the EP board members requested that he evaluate the E-Fit business and recommend a solution to their cash-flow difficulties. According to Frascogna, his primary contact at Trustmark was Bob Hardison, and Hardison was the only person that he spoke with at Trustmark regarding the terms of the agreement. Frascogna stated that Trustmark was eager to negotiate an agreement with EP in order to keep the business afloat. Frascogna testified that early on in the process, it became apparent that a release of the personal guaranties and a release of the EP deeds of trust was a substantial concern for the EP board members and an essential part of the negotiation. A Trustmark memorandum from Hardison to Frascogna was entered into evidence at trial through Frascogna's testimony. Frascogna identified the memorandum dated August 23, 2011, as the first term sheet provided by Trustmark to assist in finalizing the terms of the buy-back and restructuring plan. The term sheet memorandum lists the collateral for the "E-Fit permanent loan" as "First deed of trust on the fitness facility and security interest on the equipment. Also, assignment of leases and rents (for rental space in the facility)." Notably, there is no mention of EP's surplus thirty-three acres listed on the term sheet as collateral. At trial, Frascogna was asked by counsel, "Had it been agreed at [the time of the August 23, 2011 term sheet memorandum] that if the buy-down was successful, Enlightened Properties' land would be released . . . as security for

the loans to Cedar Lake and Enlightened Fitness?" In response Frascogna testified, "[B]y August, yes. We were zeroing in on the amount of money that it looked like the E-Fit investors would raise at the buy-back." Given Frascogna's testimony, which was corroborated by the August term sheet memorandum prepared by Trustmark, it can be inferred that EP's surplus thirty-three acres was off the table and released from further consideration as collateral for the collective loans. An additional term sheet memorandum dated October 11, 2011, was also introduced as an exhibit at trial. The collateral provision of the October term sheet is identical to that of the August 23, 2011 term sheet. There is again no further mention of EP's surplus thirty-three acres. Following the execution of the release dated October 4, 2011, Frascogna sent an email to Hardison, which was also entered into evidence at trial. While there is no date on the email, it references a meeting to take place "tonight (Wednesday, November 30, 2011)." Paragraph 3 of the email stated in part:

> All collateral shall remain the same for the refinance note except for those personal guarantees of E-Fit owners who chose to buy back their personal guarantees from Trustmark which Trustmark has cancelled and released.

Frascogna testified that there was no mention of EP within the discussion of collateral because "Enlightened was off the table and under no discussion." He described this email as part of a secondary negotiation regarding the final terms of the "renewal note, the new note . . . ."

¶35. Trustmark did not call any witnesses at trial, nor did it cross-examine any of EP's witnesses. Having found that it was necessary to consider parol evidence, the chancery court was left with only EP's exhibits and its witnesses' accounts of the "prior negotiations,

22

agreements and conversations" to consider in an effort to resolve the ambiguity.

III. **Did the chancery court rely on "irrelevant, inapplicable, or incorrect propositions" in its ruling?**

¶36. Trustmark argues that the chancery court relied on multiple irrelevant, inapplicable, and incorrect propositions in its ruling in favor of EP. However, because this Court finds no reversible error in the chancery court's ruling for the reasons set forth in the paragraphs above, this argument asserted by Trustmark does not require further analysis by this Court.

**CONCLUSION**

¶37. We find the Release, on its face, to be ambiguous as to whether Trustmark was required to cancel both deeds of trust it held encumbering EP's property. As set forth above, we have reviewed and considered the "four corners" of the Release, the discretionary canons of contract construction, and the parol evidence presented at trial. The vast majority of the language in the Release supports the notion that the parties intended a total release of Trustmark's liens against EP's land. It is still unclear whether the representatives of both parties who were involved in the negotiations and the drafting of the Release were aware that there were, in fact, two separate deeds of trust. In any event, the parol evidence allows this Court to reconcile and harmonize the various provisions of the Release. The Court finds that it was the intent of the parties that EP's property be released from both deeds of trust at issue and that the liens against the building and land owned by CLWF remain in place. In resolving the ambiguity in EP's favor, this Court finds that the chancellor was not manifestly wrong or clearly erroneous and did not apply an erroneous legal standard.

¶38. **AFFIRMED.**

23

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY AND SMITH, JJ., CONCUR. LAWRENCE, J., NOT PARTICIPATING.**

# APPENDIX

| Borrower | Amount | Rate | Current Rate | Term | Maturity Date | Payment | Collateral |
|---|---|---|---|---|---|---|---|
| Enlightened Fitness 28386217 8514 | $1,232,225 | | 5.25% | 5 yrs | 3/5/2015 | $20,256.24 | First lien position on all equipment located within E-Fit Wellness Facility. |
| Enlightened Fitness 28386217 8515 | $748,903 | | 4.50% | 1 yr | 3/1/2011 | Interest only | First security interest on A/R. Cross-collateralized with Note #8514 |
| Cedar Lake Wellness 28386225 8516 | $8,989,177 | | 5.25% | 3 yrs | 3/5/2015 | $55,126.70 | First D/T on 6 acres and Wellness facility. Assignment on all rents and leases. |
| Cedar Lake Wellness 28386225 8517 | $2,107,300 | | 4.50% | 2 yrs | 3/1/2011 | Interest only | First D/T on 33 acres surrounding E-Fit Wellness Facility |